MOORE, J.
| following a jury trial, the defendant, Donnie R. Baker, Jr., was convicted of aggravated kidnapping and carjacking for violations of La. R.S. 14:44 and 14:64.2, respectively. The trial court imposed a life sentence without benefit of probation, parole, or suspension of sentence for the aggravated kidnapping conviction, and it imposed a 20-year sentence at hard labor without benefit of probation, parole, or suspension of sentence for the carjacking conviction. The sentences were ordered to run consecutively. Baker now appeals, urging three assignments of error. For the following reasons, we affirm.
Facts
Around 6:15 p.m. on April 19, 2013, Allison Copple brought her son to Broadmoor Baptist Church to help with an event for special needs adults and delivered some cookies for the event. When she returned to her charcoal-gray Ford Explorer in the parking lot, Copple noticed a man approaching her vehicle. She testified that she assumed the man was there for the church event, so she rolled down her driver’s side window to assist him. The man looked around to see if anyone was watching, and then he dove head first into Cop-pie’s car between her and the steering wheel. Copple was still buckled into the driver’s seat of her car.
Copple described the man as a black man, wearing dark pants and a black t-shirt, with a white t-shirt underneath the black one. He had close-cut hair and a small mustache.
She initially tried to push the man back out of the window and clawed at his face *1156 trying to injure his eyes. The carjacker yanked Copple’s hair and |2hit Copple in her face. She attempted to yell, honk the horn, hit the gas and/or brake pedals, as the two continued to struggle. Ultimately, the man gained control of the car while still sitting on Copple’s lap. He drove the vehicle over a parking barrier toward Leo Avenue. As they left the parking lot, Cop-ple continued to honk the horn in hopes that someone at the church would hear it. In retaliation, the man elbowed her.
At trial, Copple testified that, as they neared the edge of the parking lot, she heard the defendant say the word “bank,” and she assumed her assailant wanted money.[1] She offered the man money in exchange for him letting her go and offered him her car. The man never took any of those things, nor did he take Cop-ple’s purse.
Leaving the parking lot, the vehicle crossed Leo Avenue into an alley behind businesses that front Youree Drive. Cop-ple testified that her view was obscured by the man sitting on her lap. She continued to struggle, and tried hitting the gas and brake pedals alternatively to garner attention. This enraged the attacker, who pushed Copple’s head toward the console of her car, twisting her neck and saying, “I’m going to kill you bitch, I’m going to kill you bitch.”
The Ford SUV then headed south on Youree Drive toward Southfield Road. Copple continued to try to draw attention to her car by waving her hands out of the window, hitting the gas and brake pedals. She said the defendant told her to get her head down, although she initially thought he | (¡said to get her hands down.
During this time, Copple said, she heard her cell phone ringing and heard a voice say “hello.” Copple did not recognize the voice, but said, “help me,” three times. The call was disconnected and then reconnected. Copple learned afterwards that the man had accidentally leaned on the steering wheel, activating the phone controls, and redialed Copple’s friend, Kelly Hodgson, with whom she had spoken about an hour earlier.
The ordeal ended when the Ford Explorer veered into the parking lot of Clark’s gas station at the corner of South-field and Youree. Copple realized that this was her chance to get out of the car. She opened the door, but was held back by her seatbelt. She unbuckled herself, pushed the door open and slid out of the car, falling onto the concrete near the AAA Rental parking lot next to Clark’s. She landed on her bottom, but hit her head on the pavement. The defendant drove away. People rushed to assist Copple, who testified that an employee of Clark’s gas station came to her aid. Someone else brought her purse that fell out when she opened the door. Another person called her husband.
A Shreveport Fire Department medical unit arrived and transported Copple by ambulance to Willis-Knighton Pierremont Hospital. Copple was placed on a backboard en route to the hospital. CAT scans determined that she suffered a concussion and a neck sprain. Additionally, Copple had a bloody nose, a busted lip, a bruise on her forehead, bruised elbows, and a bruised left knee. She was discharged from the hospital on the same night.
14Prior to her release, a Shreveport policeman took a swab of the inside of Cop- *1157 pie’s mouth and under her fingernails to obtain a reference sample of Copple’s DNA to distinguish it from possible DNA of the perpetrator. Copple stated that she had scratched the perpetrator while they were inside the car.
At trial, Copple identified the defendant, Donnie R. Baker, Jr., as the man who assaulted her. She similarly identified Baker in a surveillance video from Island Park, a residential community.
The entire incident lasted about 15 minutes. Copple testified that at no point did the perpetrator ask if she had any ATM cards. He never asked for any PIN numbers. He did not take her to any ATMs. The two of them never went inside a bank. Copple also admitted that she was unable to identify the suspect in a photographic lineup that she was shown two weeks after the incident. She explained that the photographic lineup consisted of six to eight men in small photographs with similar facial hair. She stated that those pictures are not comparable to seeing a live person. She testified that she has no doubt that Donnie R. Baker, Jr. was the man who assaulted her.
Copple’s friend, Kelly Hodgson, testified that approximately 1½ hours after speaking to Copple on her telephone, she received a second phone call from Copple. She testified, “I heard Allison say ‘help me’ three times,” and she heard a man yelling, “Put your hands down, put your hands down.”. Hodgson called 911 from her land line. The cell phone call was disconnected, but a minute later she received another call from Allison |5Copple, but she only heard rustling noises.
Ms. Jamie Lester testified that she was stopped at a traffic light at the corner of Southfield and Youree heading north when she noticed a silver SUV on the opposite side of the street stopping and going as if someone was pressing on the brake. She saw the SUV pull into Clark’s gas station, still driving erratically. Lester drove around the back of Clark’s gas station. Ms. Lester observed a purse fall out of the SUV, and then saw a lady fall out. She parked her truck and offered help. She testified that Copple appeared terrified. Her hair was matted like it had been pulled, she had blood on her face, and she had a big knot, the size of a golf ball, on the back of her head. Lester called Cop-ple’s husband. She observed the silver SUV jump the median to the parking lot, jump the median in the middle of South-field, and continue to proceed to the left.
A store clerk for Clark’s, Christine Bo-gosh, testified that she heard the squeal of tires and a woman screaming. She saw a truck coming at a high rate of speed. As the truck passed, Bogosh saw a purse fly out of the driver’s window and arms, black and white, flailing. It looked as if two people were sitting in the driver’s seat. Bogosh saw a blonde-haired woman come out of the vehicle. She testified, “I don’t know if she was pushed, shoved, or if she jumped out of the driver’s door.” The woman landed on the pavement on her back, hitting and then bouncing her head on the pavement. The car sped away on Southfield, running over the median. Bo-gosh rendered assistance to Copple, as did at least two other ladies. Bogosh testified that the woman was shaking and crying and appeared | lightened.
Alisa Laskey testified that on April 19, 2013, she was outside her home near Broadmoor Baptist Church “hula-hooping” when she noticed a man walking around the church’s south parking lot looking into vehicles. Laskey described the man as a *1158 black male with short hair, between five feet, seven inches or five feet, eight inches tall, 150 or 160 pounds, and wearing dark-colored clothing. Soon thereafter, she and her family heard yelling and screaming. The man was standing by an SUV in an altercation with a female in the driver’s seat. She said he either jumped in the window or got through the door of the SUV. Laskey observed arms flailing; she heard screaming; and then, after approximately five minutes, she observed the SUV jump a curb. After the SUV jumped the curb, it exited onto Leo Street, turned right and ended up on Youree Drive. Las-key took a picture of the vehicle and called 911. The man Laskey saw in the vehicle was the same man she previously saw roaming the parking lot.
While he was driving south on Youree Drive, Charles Reed testified that he saw a vehicle in front of him at the intersection of Southfield and Youree lurch forward and stop approximately three or four times. When the car turned into Clark’s gas station, he followed it. Reed saw the ear door open and a woman screaming and struggling to get out of the car. She fell backwards out of the car onto her back. Reed pursued the vehicle traveling at speeds up to 70 miles per hour. Reed was able to keep up with the vehicle for some time, but as the vehicle made a turn at the corner of Horton and 70th, he lost sight of it. Reed returned to Clark’s gas station where he 17observed Copple, who had bruises, dark discoloration and blood around her mouth. He informed the police of everything he had observed.
Later that evening, Royce Williams testified that he saw a strange man standing in an empty lot in the Island Park subdivision off Clyde Fant Parkway. As president of the homeowners’ association, Williams became concerned about it, and went home to retrieve his cell phone. When he returned to the lot, the man was gone.
The next morning, Williams received a complaint from one of the residents in the neighborhood regarding a vehicle parked in an undeveloped wooded area on private property. The vehicle was a grayish-green Ford Explorer with a car sticker on it. Police had the vehicle towed away.
Meanwhile, Williams checked the surveillance cameras at the subdivision’s clubhouse to see if the cameras had captured anything. The cameras showed the same man Williams had seen the day before walking from Paradise Road to the clubhouse, knocking on the door and attempting to open it, and walking away. The surveillance cameras also showed a vehicle driving to the remote area mentioned above and a man walking back from that location. At trial, Williams identified the defendant, Donnie R. Baker, Jr., as the man he saw on the lot as well as the man he saw on the surveillance camera video.
On the evening of the incident, Detective Erie Farquhar of the Shreveport Police Department’s Crime Scene Unit was dispatched to Willis-Knighton Pierremont Hospital. He collected DNA samples from underneath Copple’s fingernails on both of her hands and he also swabbed hblood on her left hand. Farquhar additionally took a reference sample, a swab inside of Cop-ple’s mouth. He then transported the samples to the North Louisiana Crime Lab.
Detective Farquhar also photographed and swabbed the interior of Copple’s SUV that was located at the Shreveport Police impound bay on Greenwood Road. He discovered three areas that appeared to be *1159 blood on the driver’s seat of the vehicle. He also found human hair on the floor between the door and the driver’s seat. Farquhar helped take fingerprints, but detectives were unable to make a fingerprint match in this case.
Detective John Jackson of the Shreveport Police Department’s Robbery Division testified that he was dispatched to South-field and Youree on April 19, 2013 at approximately 7:00 p.m. to investigate the incident. When he arrived, Jackson observed the victim, Allison Copple, near the parking lot of AAA Rental. She had scratches and abrasions on her arms and a significant amount of blood around her nose and mouth. She was wearing a neck brace, and had a large bump on her head. Jackson obtained the details of the incident as well as a description of the vehicle.
Copple’s Ford Explorer was recovered at 1105 Island Park in a secluded area near a construction site the following day. Detective Jackson testified that the Island Park video showed a Ford Explorer matching the description of Copple’s SUV drive into the area where Copple’s vehicle was recovered. The video showing a black male leaving the area where the vehicle was ditched and attempting to enter the doors on the clubhouse was delivered to local media outlets, broadcast on four news channels and ^published in newspapers.
On May 7, 2013, Detectives Jackson and Jack Miller went to 1501 Clover Street, the residence of Baker’s girlfriend, Brittany Hudson, and arrested the defendant. Detective Jackson identified the defendant as the person he arrested. Jackson observed a large scratch on Baker’s face in the same area that Copple described as the place where she scratched her attacker in the face.
Michelle Vrana of the North Louisiana Criminalistics Laboratory testified that blood samples obtained from the swabs of suspected blood taken from Copple’s hand and one sample of suspected blood from the driver’s seat was consistent with the DNA profile obtained from the reference swab of Copple. Vrana stated that there is a one in two quadrillion chance that there would be someone else’s DNA in items four and six besides Allison Copple. However, Vrana further testified that two swabs of suspected blood from the driver’s seat middle and two swabs of suspected blood from the driver’s seat headrest were consistent with the DNA profile obtained from Donnie R. Baker, Jr. She testified that there is a one in 32.1 quadrillion chance that there would be someone else’s DNA in these swabs other than Donnie R. Baker, Jr.
After the prosecution ended its case, the defense presented an alternative version of the events that evening. Testifying in his own defense, Donnie R. Baker, Jr. said that he was working at Ryan’s Buffet on Youree Drive on April 19, 2013. He recalled taking his lunch break between 5:00 and 5:45. A friend called him requesting Lortabs, but he |innever met with the friend. He went to the Broadmoor Baptist Church parking lot and approached a person to sell Lortabs. When asked how he ended up in Copple’s SUV, he testified:
In the SUV, I was sitting on the passenger side, and Ms. — the woman, she was sitting on the driver’s side. And I asked her — before I got in the SUV I asked did she want to — would she like to buy some Lortab. I approached, said “I’m not a police or anything, but do you want to buy some Lortab? Do you do Lortab?” She say, “What kind you have?” I say, “I have Lortab 10.” And she say, “Get in the car. Can’t do it out here.”
*1160 Baker testified that the woman had an issue with the Lortab pills. They did not appear to be the dosage that Baker had claimed. They discussed the price for the Lortabs-$30 for 7 pills-and she gave Baker two $20 bills. He returned to his vehicle to retrieve change when the woman proceeded to drive off, but stopped because of oncoming traffic. He jumped in the passenger side of the SUV to retrieve his pill bottle that he left in the SUV. As they pulled off, the woman was screaming and pushing him, specifically his arms. He grabbed her and told her to stop. Baker claimed she scratched only his left arm and that the scratch on his face came from an incident at work. He admitted that he hit Copple because she had scratched up his arms and hit him in the face. He said Copple pushed the gas and he hit the brakes repeatedly for a couple of blocks until the woman finally stopped the SUV. He testified that the woman offered him money. After the SUV stopped, the woman grabbed her purse and got out of the car and ran over to people waiting. Baker stated that the people were “charging” him, and the car kept rolling, so he jumped from the passenger side to the driver’s side and drove off in fear. He also stated that he was afraid of a Inman in a truck that was following him.
Baker testified that at no time did he demand any money from the woman; he did not ask to go to the ATM; he did not contact any third party to ask for any kind of money for her release; he did not ask the woman about any credit or ATM cards.
Later that evening, he went back to the Broadmoor Baptist Church parking lot, but did not take his vehicle because he had thrown both his and Ms.' Copple’s keys into a pond. He also went back to the parking lot on the following day with his brother.
On cross-examination, Baker gave additional details about the person who initially called about the Lortab pills. He said the person was a previous buyer named Kayla Green. Green instructed him to meet her at the Broadmoor Baptist Church parking lot as they had done in the past. However, when Baker arrived at the Broadmoor Baptist Church parking lot, he did not see Kayla or her car. Baker called Kayla, but could not reach her and decided to wait for her. Baker admitted that he was the person in the surveillance video at the Island Park subdivision. Baker said that he had just gotten paid on the day in question, but that he was selling Lortabs because he was late on his rent.
Following closing arguments, on May 28, 2014, the jury found Baker guilty as charged. On May 29, 2014, the court denied defense motions for post-verdict judgment of acquittal and new trial and sentenced Baker.
Prior to imposing sentence, the court reviewed the facts of the case and the sentencing guidelines of La. C. Cr. P. art. 894.1. The court did not 112find that any mitigating factors were applicable in this case. The court found numerous aggravating factors, asserting that there was an undue risk that the defendant would commit another crime. Prior to the crimes at issue, Baker had served a 15-year armed robbery sentence from which he was recently released. Baker admitted that he is a drug dealer. These facts indicated that Baker would continue in the same pattern. The court also noted that the victim was head-butted, struck repeatedly; had a concussion; was particularly vulnerable and likely will suffer permanent emotional and psychological injury. Additionally, Baker put another life in danger by fighting for control of the vehicle.
*1161 The court sentenced Baker to the statutorily mandated sentence of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence for the aggravated kidnapping conviction. It sentenced Baker to serve -20 years at hard labor without benefit of probation, parole or suspension of sentence for the carjacking conviction. It ordered the sentences to be served consecutively.
Defense counsel made a motion to reconsider sentence, which was denied. This appeal followed.
DISCUSSION
The defendant raises three assignments of error on appeal, the second of which charges that the evidence was insufficient to support each of the two convictions. On appellate review, sufficiency of evidence claims are considered first because the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
11sBaker contends his conviction for aggravated kidnapping cannot be sustained because nothing of value or any advantage or immunity was sought from the victim or (in exchange) for the victim’s release. In other words, Baker contends that the “extortion element” of the offense was not shown. He also argues that the conviction of carjacking be vacated because he did not enter Copple’s car with the intent to take it by force or intimidation. In fact, he left Clark’s gas station out of fear for his safety.
The'state counters this argument, stating that it is not necessary for the kidnapper to explicitly express his intent to extort the victim to give up something of value. Intent can be inferred from the facts of the case.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Anderson, 29,282 (La.App. 2 Cir. 6/18/97), 697 So.2d 651. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
Aggravated kidnapping is the (1) forcible seizing and (2) carrying of any person from one place to another with (3) the intent thereby to force the victim to give up anything of value in order to secure a release of the person |14who is in the offender’s actual or apparent control. La. R.S. 14:44. Specific intent is a state of mind which may be inferred from the circumstances of the transaction and defendant’s conduct. Whether the requisite intent is present in a criminal case is determined by the fact finder. State v. Hill, 40,023 (La.App. 2 Cir. 9/21/05), 911 So.2d 379, writ denied, State ex rel. Hill v. State, 2006-1476 (La.3/9/07), 949 So.2d 434; State v. Hunter, 454 So.2d 131 (La.App. 2 Cir.1984).
The evidence at trial with respect to the first two elements of the offense was overwhelming. Copple’s testimony and that of other witnesses showed that the defendant forcibly took over her vehicle and transported her from the church parking lot to Clark’s gas station where she *1162 escaped. Viewed under the Jackson standard in the light most favorable to the prosecution, any rational trier of fact could have found that these two essential elements of aggravated kidnapping were proven beyond a reasonable doubt.
The critical issue concerns the evidence to support the third element of the offense, namely, the intent to force the victim to give up anything of value to secure her release. The defendant contends the record does not show that he possessed the intent to force the victim to give up something of value in exchange for release, and thus the state failed to establish the extortion element of aggravated kidnapping. We disagree.
In determining whether an aggravated kidnapping has occurred, the crucial question is whether the defendant sought to obtain something of value by playing upon the victim’s fear and hope of eventual release in 11fiorder to gain compliance with his demands. State v. Roberts, 31,219 (La.App. 2 Cir. 9/23/98), 718 So.2d 1057, writ denied, 99-1191 (La.9/24/99), 749 So.2d 627; State v. Arnold, 548 So.2d 920 (La. 1989). Proof of intent to extort is shown not merely by the kidnapper’s words or actions, but by analyzing whether a reasonable person in the victim’s position would believe that she would not be safely released unless she complied with the kidnapper’s demands. Id.
In the present case, Baker forcibly entered Copple’s SUV through the window. Copple fought Baker over control of the car, but Baker ultimately prevailed. Co'p-ple testified that before they got out of the church parking lot, she heard Baker mention the word “bank:”
As we neared the edge of the parking lot, which was not that far, I heard him say the word, “bank,” and I just latched on to that word and just kept saying I have money, I have money. That was the other thing I’d been saying; just let me go, just let me go, just let me go, I have money.
I had money in my purse, several hundred dollars. I would have happily given him the purse. I kept saying, You can have my car, you can have my money, I have money, I have money, just let me go, just let me go, just let me go. I said I have children.
[[Image here]]
And so when he said the word bank, I thought maybe he wanted money, and so I kept saying I have money, I have money, just let me go.
The fact that the defendant forcibly prevented the victim from leaving the car while threatening her, hitting her, and commanding her to be quiet and get her head down, provides a factual basis to conclude that Baker intended to extort something of “value” from his victim in exchange for her release. In State v. Arnold, supra, the supreme court addressed the failure of |1fithe kidnapper to explicitly communicate the intent to extort by explaining that intent is manifested not merely by the kidnapper’s words or actions, but by analyzing whether a reasonable person in the victim’s place, given the totality of the circumstances, would believe that he or she would not be safely released unless he or she complied with the kidnapper’s demands. Hence, all the law requires is evidence of the defendant’s intent to extort something of value by playing upon the victim’s hope of release.
Although in this instance, Ms. Copple managed to escape before the kidnapper made an actual verbal demand upon her to *1163 obtain her release, we conclude that, given the facts and circumstances of the incident, a reasonable person in Ms. Copple’s place would believe that she would not be safely-released unless she complied with whatever demands Baker intended to make. Thus, viewing all of the evidence in the light most favorable to the prosecution, we find the jury could have reasonably concluded that the defendant’s threatening actions manifested an intent to exploit the victim’s fear and force her to surrender something of value in the hope of securing a safe release. We conclude that the record supports the defendant’s conviction of aggravated kidnapping.
Carjacking is the intentional taking of a motor vehicle belonging to another person, in the presence of that 117person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle, by the use of force or intimidation. La. R.S. 14:64.2. Thus, the elements of carjacking are: (1) the intentional taking (2) of a motor vehicle, as defined in R.S. 32:1(40)(3) belonging to another person (4) in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle (5) by the use of force or intimidation.
Here, Baker forcibly jumped through the window of Copple’s SUV, while she was inside the vehicle and forcibly took control of the vehicle. Baker then drove the SUV away from its location at the Broadmoor Baptist Church parking lot, cut through a gas station parking lot where Copple escaped, and then sped off. He was pursued by Charles Reed, but eluded capture. Ultimately he abandoned the vehicle in the wooded area in the Island Park subdivision. Baker admitted after Copple jumped out of the vehicle, he proceeded to drive away, not with the intent to take the SUV, but out of fear for his own safety. The jury obviously did not believe his story, which was not supported by the evidence. We therefore find that the evidence submitted was sufficient to sustain a conviction for carjacking.
This assignment is without merit.
In his first assignment of error, Baker contends that the trial court erred by allowing the state to transfer the criminal trial proceedings against him to a “swing judge” over his objection. He maintains that this criminal matter should have proceeded to trial and sentencing in front of the Section 3 presiding judge to which it had been randomly allotted.
At issue here is a new local rule adopted by the First Judicial District Court that became effective on May 1, 2014, two weeks prior to the instant jury term. This new local rule, Appendix 14.0A[2] *1164 (“App.14.0A”), provides 11sfor “backup judges” to preside over criminal jury trials.
This case was assigned by random allotment to Section 3 of the First Judicial District. Judge Brady O’Callaghan presides over Section 3. When the case was called up for trial on May 19, 2014, Judge O’Callaghan initially heard argument on an oral motion to continue by defense counsel. Afterwards, the court informed counsel that it intended to deny the motion and to employ the recently enacted local rule 14.0A which permits the use of a “backup” judge. When Judge O’Callaghan asked defense counsel what her position would be regarding this move, counsel replied that she would object to assigning the case to a swing judge. The court then noted it would hold a hearing (as required by the local rule) momentarily to make sure the defendant’s due process rights were protected, and he provided defense counsel, who was understandably unaware of the new rule, with a copy of the rule and the factors to be considered by the court.
119The court took up the matter, and the assistant district attorney (“DA”) informed the court that Judge Brun[3] had advised that he would be willing to accept the case of Donnie Baker and try it this week. The DA requested that the “transfer be made so that we can have both these cases adjudicated this week.” He argued that transferring the case would serve the interest of judicial economy and the efficient administration of justice.
Addressing each of the four factors listed in App. 14.0A that a court should consider before transferring a case to a backup judge, the DA argued that using a backup judge would not compromise the principle of random allotment in a manner inconsistent with due process because neither the Section 3 judge, nor Judge Brun, had any particular interest' in or knowledge of the case. Baker would receive a neutral, impartial magistrate under either judge. The DA also noted that the judges at the First District had unanimously enacted the “backup judge” rule, and they would not have done so if they thought it was inconsistent with due process.
Even though the defendant did not file a motion for a speedy trial, the DA argued that a transfer of the case would support the interests of both sides in a speedy trial: the victim and her family have suffered from the incident and the defendant has been incarcerated for more than a year and has an interest in seeing his ease quickly adjudicated.
Next, he noted that the case was straightforward and did not present any complex legal issues. There had been very few pretrial motions other than discovery motions filed by both sides.
| ¡^Finally, the DA argued that transferring the case to Judge Brun this week would serve the interest of justice. The state and victim had a strong interest in having the matter adjudicated. The victim was brutalized physically and emotionally. *1165 It was important for her and her family that the matter be adjudicated so she could begin the healing process.
Defense counsel argued that the new local rule undermined the due process safeguards of random allotment. She began her argument by asking if “this was the state’s request for the case to be moved to Judge Brun?” To which, the district attorney responded: “Yes, it’s the state’s request, your honor.”
Defense counsel then argued that for the DA’s request that the case go to a specific judge violated the random allotment rules. She noted that the state previously argued that the accused has no right to have a particular judge try his case. This is the reason for random allotment, she argued. Neither side can judge shop. By allowing the case to be transferred to Judge Brun (pursuant to the DA’s request) the defendant’s due process right of random allotment would be defeated.
Counsel discounted the state’s speedy trial argument. The right to a speedy trial is a right of the defendant, not necessarily the injured party. She noted that she had moved for a continuance because a speedy trial would not benefit the defendant.
In rebuttal, the DA downplayed his earlier “specific request” to have the trial presided over by Judge Brun, stating that the only reason he requested Judge Brun was because Judge Brun, now serving as judicial | ⅞1 administrator, was available for this type of work. He said he also inquired whether Judge Marcotte (Section 5) would be available, but Judge Marcotte would not be able to start until Wednesday, whereas Judge Brun could start that day, Monday. He also said that if Judge Bryson had been in the role of judicial administrator, he would have asked Judge Bryson. “It is the position,” he argued, “not the person.”
The court overruled the defense’s objection and transferred the case to Judge Brun. It stated that Judge Brun was an elepted judge, although now retired, “and does serve with the authorities, a judge pro tempore by appointment of the Louisiana Supreme Court [and] he is also our judicial administrator.” The preferred practice, he said, would be for the requests for backup judges originate with the section of court to obviate any concern that the DA’s office had any interest. It concluded, however, that the DA’s request for a backup judge in this case was not' an attempt to manipulate which judge or section would try the case. The DA, when questioned by the court, said the state would be willing to present the case to any backup judge available. Judge O’Callaghan noted that neither he, nor Judge Brun, had any knowledge of the facts of the case, and had not had any evidentiary hearings in the case. Finally, Judge O’Callaghan said that he had asked'Judge Brun earlier while passing in the hall if he was available this week if a case came up, and Judge Brun said he would be available.
On appeal, the arguments are essentially the same as those made in district court. Baker argues that the new rule violates due process because it creates a method for the district attorney to undermine random allotment |22and to forum shop: because it is the district attorney who moves to set eases for trial, it can determine which matter will be tried by the section to which it was randomly allotted and which matter goes to a likely backup judge. In this case,' it requested that the matter be *1166 transferred to a particular judge after discussing it first with the prospective swing judge.
The state now contends that it merely inquired whether Judge Brun was available to serve as the backup judge. Since another trial had been called in Section 3 and would take most of the week, and since Judge Brun advised that he would be willing to accept the present case, it was requesting that the transfer be made to Judge Brun so that the case could be adjudicated that week as scheduled. Transferring the case would serve the interest of judicial economy and the efficient administration of justice. The case was over a year old; Judge Brun did not have any particular interest in the case; the victim and witnesses were ready and willing to testify; and the victim was ready to get the case resolved as she presented in a fragile emotional state.
We begin our analysis by noting that the appellate record regarding this issue is not well developed. It does not contain, and neither party thought to introduce, a copy of the Section 8 docket to show its date, length, positioning of cases, etc. This information would have greatly assisted our analysis of the effect the new rule has on random allotment. Nor does the record contain, and no one introduced, the Louisiana Supreme Court order appointing Judge Brun as a pro tempore judge, which would establish the extent and scope of this retired judge’s authority and powers. Finally, the l^record contains no testimony or information regarding the role the judicial administrator has with respect to the newly enacted local rule creating the “backup” judge position.
“To meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court, or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned.” State v. Simpson, 551 So.2d 1303 (La.1989). “A rotation or allotment system is not acceptable if the event which triggers application of the system is dependent upon an action taken by the district attorney.” State v. Cooper, 2010-2344 (La.11/16/10), 50 So.3d 115.
The supreme court further said in State v. Cooper, supra:
In Simpson, we stated that “[d]ue process of law requires fundamental fairness, i.e. a fair trial in a fair tribunal.” However, due process does not entitle a criminal defendant to selection of the manner in which the judge of that tribunal is designated. A criminal defendant does not have the right to have his case heard by a particular judge, does not have the right to have his judge selected by a random draw, and is not denied due process as a result of an error in a particular judge’s selection unless she can point to some resulting prejudice.
* ⅜ ⅜
While the one judge/one case arrangement might be a laudable goal of a case allotment system, that circumstance has never been a requirement of random allotment. We recognize the impracticality of such a requirement — judges get sick, take vacation, have conflicts within their own dockets, resign, or are elected to a different bench. All of these circumstances often result in a case being assigned to another judge for adjudication. The fact that more than one judge *1167 handles aspects of any one criminal case does not, in and of itself, prejudice the criminal defendant. As will be discussed further in the analysis of the defendant’s due process argument, a [^criminal defendant does not have a right to have his case heard by a particular judge.
Based on this record, we are unable to ascertain whether it was the district attorney or the Section 3 court who selected which of the two cases would be transferred to the “backup” judge. The state admits that it spoke with Judge Brun, who is the judicial administrator, prior to the hearing “inquiring” whether he would be available to preside over the trial of the case. The defense contends that because of this, the district attorney, in effect, selected which judge would try this case, as a result, it undermined the built-in due process safeguards of random allotment.
Clearly, the language of the local court rule contemplates that the district court, not the district attorney, will initiate any agreement with a prospective “backup” judge to preside over the additional trial. The trial judge of the division to which the case is assigned has ultimate control of the scheduling of criminal cases for trial, although the district attorney has the primary responsibility to move to set criminal cases for trial. Simpson, supra at 1304-OS; La. C. Cr. P. art. 17. Accordingly, the court, and not the district attorney, must decide which case goes to the “backup” judge.
The record reflects that ultimately, the section judge made the determination whether to permit the backup judge to hear this case. There is no evidence in this record that the district attorney sought any advantage or would obtain any advantage by trying the case before Judge Brun. There was not a particularly complex procedural history in the case that might pose difficulties for the trial judge or the parties.
lasNor has the defendant shown that he was prejudiced in any way by a trial that was presided over by a backup judge. Nevertheless, counsel for the defendant insists that the backup judge provision or local rule itself is tainted. Counsel argues that it allows a district attorney to manipulate the random allotment system: the district attorney can determine by case settings which administrative judge is most likely to be available to conduct a trial and it has the power to determine which trial is called first in front of the section of court to which it is assigned.
We are not persuaded by counsel’s arguments that local rule App. 14.0A enables the district attorney’s office to manipulate the random allotment system in its favor. When faced with circumstances such as those in this case, the court has the authority to determine whether a particular case will be assigned to a backup judge. Nor do we find that the defendant was prejudiced in any way by the assignment of a backup judge to preside over his trial.
This assignment is -without merit.
In his third and final assignment of error, Baker alleges that the sentence imposed was unconstitutionally harsh and excessive given the facts and circumstances of the case. He argues that a downward departure from the statutorily mandated life sentence for aggravated kidnapping is warranted because at least two of the aggravated factors that the trial court listed do not apply to him. Specifically, no testimony was submitted to show that any other driver or pedestrian was endangered or injured during this incident. Addition *1168 ally, Copple was not particularly vulnerable as she is 1 Mnot incapable of resistance due to extreme youth, advanced age, disability or ill health. Moreover, Baker is hardly the worst of offenders.
The state argues that the appellant did not present any evidence and offered no reason for a downward departure from the mandatory aggravated kidnapping life sentence.
La. R.S. 14:44 provides, whoever commits the crime of aggravated kidnapping shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
La. R.S. 14:64.2(B) provides, whoever commits the crime of carjacking shall be imprisoned at hard labor for not less than two years and for not more than 20 years, without benefit of parole, probation, or suspension of sentence.
Appellate review of sentences for excessiveness is a two-pronged inquiry. First, the record must show that the sentencing court complied with La. C. Cr. P. art. 894.1. The court need not list every aggravating or mitigating factor so long as the record reflects that it adequately considered the guidelines. State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819; State v. Linnear, 44,830 (La.App. 2 Cir. 12/9/09), 26 So.3d 303. When the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even in the absence of full compliance with the article. State v. Lobato, 603 So.2d 739 (La.1992); State v. Linnear, supra. The important elements which should be considered are the defendant’s personal history (agej family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App. 2 Cir. 8/13/08), 989 So.2d 259, writ denied, 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Taves, 03-0518 (La.12/3/03), 861 So.2d 144; State v. Caldwell, 46,718 (La.App. 2 Cir. 11/2/11), 78 So.3d 799.
Second, a sentence violates La. Const, art. I § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166.
The trial court has wide discretion in the imposition of sentences within the statutory limits. The sentence imposed will not be set aside as excessive absent a manifest abuse of that discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Diaz, 46,750 (La.App. 2 Cir. 12/14/11), 81 So.3d 228. On review, an appellate court does not determine whether another sentence -may have been more appropriate, but whether the trial court abused its discretion. State v. Williams, supra; State v. Free, 46,894 (La.App. 2 Cir. 1/25/12), 86 So.3d 29.
The mandatory statutory punishment for a conviction of aggravated kidnapping is life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:44. Since the sentence is mandatory, the trial court is legally required to impose it.
*1169 LsWhere there is a mandatory sentence, there is no need for the trial court to justify, under Article 894.1, a sentence it is legally required to impose. State v. Hill, supra.
In rare circumstances, a downward departure from a mandatory sentence may be warranted if the defendant shows, by clear and convincing evidence, that he is exceptional, namely, that he or she is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Dorthey, supra. Although courts have the power to declare a mandatory minimum sentence excessive under Article I, Section 20 of the Louisiana Constitution, this power should only be exercised in rare cases and only when the court is firmly convinced that the minimum sentence is excessive. State v. Ponsell, 33,543 (La.App. 2 Cir. 8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490.
Here, in an effort to show that a downward departure from the mandatory sentence is warranted, Baker states that no testimony was submitted to show that any other driver or pedestrian was endangered or injured during this incident. Additionally, Baker asserts that Copple was not particularly vulnerable as she is not incapable of resistance due to extreme youth, advanced age, disability or ill health. These things, alone, do not show that Baker or .the circumstances of the case, are “exceptional” such that a downward departure in the sentence is appropriated The trial court found no mitigating factors helpful, though it may be noted that Baker was gainfully employed and appeared to have a strong family support |29system. Baker admitted in court that he dealt drugs. He also admitted that he violated his parole for a previous conviction of armed robbery. The trial , court additionally noted that there was an undue risk that the defendant would commit another crime; the victim was head-butted, struck repeatedly; she had a concussion; she was particularly vulnerable and she likely will suffer permanent emotional and psychological injury. Additionally, Baker put lives in danger by fighting for control of the vehicle. Thus, the court did not abuse its discretion and the defendant has failed to clearly and convincingly show that he is “exceptional” and that the mandatory sentence is not meaningfully tailored to the gravity of the offense.
The crime of carjacking is punishable by imprisonment at hard labor for not less than two years and for not more than 20 years, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:64.2(B).
The first prong of the excessive sentence test is that the record must show that the sentencing court complied with La. C. Cr. P. art. 894.1. This includes important elements such as personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation.
The record reflects that the court complied with La. C. Cr. P. art. 894.1. Specifically, the trial court noted that there were no mitigating factors applicable to this case. In addition to the above aggravating factors, the trial court also noted that the offenses to which the appellant has been convicted manifested a deliberate cruelty to the victim; the victim will likely experience permanent emotional and psychological injury from the events |anof the crime; the defendant knowingly created a risk of *1170 death or great bodily harm to more than one person by engaging in fighting over control of the vehicle; and the defendant has still failed to take responsibility for his crime and outrageously claimed the victim was a liar in her testimony.
The second prong of the excessiveness test is whether the sentence violates La. Const, art. I § 20. A sentence violates La. Const, art. I § 20 if it is grossly out of proportion to the .seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. In other words, the sentence shocks the sense of justice. Considering the factors articulated by the trial court, which are supported by this record, the 20-year sentence imposed does not shock the sense of justice. Consequently, the trial court did not abuse its discretion in imposing a 20-year sentence upon Donnie R. Baker, Jr. for carjacking.
Finally, upon review of the record, we find that the trial court inadequately advised Baker of the time delays to apply for post-conviction relief by simply informing him that he has “two years to seek post-conviction relief.” The trial court should have advised the defendant in this case, and we now advise him by this opinion, that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922.
CONCLUSION
For the foregoing reasons, the convictions and sentences of the defendant are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.

. The state introduced into evidence a photograph of the ANECA Federal Credit Union building located across and down the street from Broadmoor Baptist Church and a photograph of the ATM machine in the building. The defense made no objection.

. Appendix 14.0A, under the heading, "BACKUP” JUDGES, provides:
In the interests of judicial economy and the efficient administration of justice, when a section of the Criminal Division has more than one case ready to proceed to jury trial during a particular jury term, the judge of that section and any other judge, elected, appointed or pro tempore, of the First Judicial District Court, hereinafter the "backup" judge, may agree that the backup judge may preside over any additional trials during that jury term.
If either the District Attorney or defendant objects to the case being heard by the backup judge, the section judge shall determine whether or not to permit the backup judge to hear the case and may conduct a hearing to assist in that determination. The section judge shall base his or her determination on the following factors:
(1) Whether the assistance of the backup judge would compromise the principle of *1164 random allotment of criminal cases in a manner inconsistent with Due Process;
(2) Whether the interest in a speedy trial is best served by employing the assistance of the backup judge.
(3) Whether the nature or complexity of the procedural history of the case would hinder the backup judge in making rulings consistent with that procedural history;
(4)Any other consideration relevant to the interests of justice.

. Judge Brun is the judicial administrator for the First Judicial District Court. He is a retired district judge from that court.