GARRETT, J.
| iThe defendant, Adrian Tyrone Little, pled , guilty to second degree murder and was sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, he contends that the trial court imposed an excessive sentence because it failed to adequately consider his mental retardation. We affirm the defendant’s conviction and sentence.
FACTS
On November 9, 2013, James Allen Ro-sypal, a 21-year-old convenience store clerk, was shot and killed during an armed robbery of the Exxon Food Fast store on Airline Drive in Bossier City. The murder was captured on the store’s video surveillance equipment. Later that day, the 22-year-old defendant, accompanied by his mother, turned himself in to the police and confessed to robbing the store and shooting the victim. However, he repeatedly insisted that he did not intend to shoot the victim.
The defendant was indicted for first degree murder. • The state filed a notice of its intent to seek the death penalty. However, it later withdrew that notice, stating that it had a mental evaluation showing that the defendant’s IQ fell within the mild mental deficit range.
*402 Pursuant to a request made by defense counsel for the appointment of a sanity commission, the trial court appointed Dr. George Seiden and Dr. Richard Williams, both psychiatrists, to report on the defendant’s mental capacity and ability to proceed. Based upon the reports submitted by the doctors, the court ruled in July 2014 that the defendant was capable of assisting counsel and competent to stand trial. Both doctors also opined that 12the defendant was able to distinguish between right and wrong at the time of the offense.
The defendant later changed his prior plea of not guilty to not guilty and not guilty by reason of insanity.
Subsequently, the state amended the charge against the defendant to second degree murder. The defendant again entered pleas of not guilty and not guilty by reason of insanity. At this time, a hearing was held to determine the voluntariness of the defendant’s statement to the police. The court ruled that the confession was free and voluntary and admissible at trial.
On June 22, 2015, the date set for trial, the defendant.withdrew his prior pleas and pled guilty to the second degree murder charge. The trial court ordered a presen-tence investigation (PSI). report and agreed to hear testimony from Dr. Bruce McCormick, a psychologist who was going to be a defense witness at the trial. At a hearing held on June 25, 2015, the defense presented testimony from Dr. McCormick, who was accepted as an expert in clinical, medical and school psychology. Although he never interviewed the defendant, Dr. McCormick reviewed the defendant’s school records and made general observations about IQ test results. The matter was then set for sentencing in August, pending receipt of the PSI report and victim impact statements.
On August 18, 2015, the trial court imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant filed a motion to reconsider sentence which asserted the following grounds for reconsideration of his mandatory life sentence: (1) his age of 22 years at the time of the murder; (2) his status ás a true first felony offender; and (3) his mental retardation and his IQ, [ ¡¡which fell between 42 and 65 and allegedly equated to a mental age of nine years old. On September 29, 2015, the trial court denied the' defendant’s motion to reconsider sentence.
The defendant appeals his sentence as excessive. .
LAW
A reviewing court imposes a two-prong test in determining whether a sentence is excessive. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Shipp, 46,715 (La.App.2d Cir.11/2/11), 78 So.3d 805. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior crimina:! history, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Mandigo, 48,801 (La.App.2d Cir.2/26/14), 136 So.3d 292, writ denied, 2014-0630 (La. 10/24/14), 151 So.3d 600.
Second, a sentence violates La, Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffer *403 ing. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Shipp, supra. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Jackson, 48,534 (La.App.2d Cir.1/15/14), 130 So.3d 993.
|4It is within the legislature’s prerogative to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to . be unconstitutional. State v. Dorthey, supra; State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 1999-3151 (La.4/7/00), 759 So.2d 92. The decision to assess mandatory life sentences is within the prerogative of the legislature. State v. Parker, 416 So.2d 545 (La.1982); State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, writ denied, 2007-0530 (La.12/7/07), 969 So.2d 619.
When there is a constitutional mandatory sentence, a trial court need not justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. State v. Baker, 49,841 (La.App.2d Cir.5/20/15), 166 So.3d 1152, writ denied, 2015-1219 (La.3/4/16), 185 So.3d 745.
In rare circumstances, a downward departure from a mandatory sentence may be warranted if the defendant shows, by clear and convincing evidence, that he is exceptional, namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. State v. Johnson, 1997-1906 (La.3/4/98), 709 So.2d 672; State v. Dixon, 42,594 (La.App.2d Cir.1/16/08), 974 So.2d 793, writ denied, 2008-0711 (La.10/10/08), 993 So.2d 1282, cert. denied, 556 U.S. 1186, 129 S.Ct. 1989, 173 L.Ed.2d 1092 (2009). Although courts have the power to declare a mandatory minimum sentence excessive under Article 1, § 20 of the Louisiana Constitution, this power should be exercised only in rare cases and only when the court is firmly convinced that the minimum sentence is excessive. State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490; State v. Baker, supra.
The legislatively mandated sentence for second degree murder is life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La, R.S. 14:30.1.
DISCUSSION
The defendant argues that he is mentally retarded and that mentally retarded defendants should be afforded the same protections given to juvenile, defendants in Miller v. Alabama, - U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).
In support of his argument, the defendant compares the treatment of mentally retarded defendants and juvenile defendants. Specifically, he notes that, in recent years, the courts have modified the manner in which both categories of offenders may be punished. In 2002, the United States Supreme Court held that the executions of mentally retarded criminals were “cruel and unusual punishments” prohibited by the Eighth Amendment. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In 2005, the Court banned the execution of individuals who were under 18 years of age at the time of their capital crimes,' finding that such constituted cruel and unusual punishment in violation of the Eight Amendment. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). In 2012, the Court held mandatory life imprisonment without *404 parole for defendants under the age of 18 at the time of their crimes was also a violation of the Eighth Amendment. Miller v. Alabama, supra. Defense counsel contends that expanding the Miller prohibition of a mandatory life sentence without ^parole to a mentally retarded defendant would be the next progression in the evolution of sentencing law.
At the outset, we note that the evolution in juvenile sentencing is based upon factors unique to juveniles. In Miller, supra, the Court relied heavily upon Roper, supra, and Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010),[1] both of which referenced the fact that juveniles are more capable of change than adults, that their actions are less likely to be evidence of “irretrievably depraved character” than are the actions of adults, and that there is a greater possibility of reform over time as the juvenile matures into adulthood. Those factors are not necessarily applicable to a defendant with an intellectual disability such as the defendant. Furthermore, none of the experts involved in the instant case indicated that this defendant’s condition was likely to change for the better as time progressed.
In order to warrant a downward departure from the mandatory life sentence for second degree murder, the defendant must clearly and convincingly show that he is “exceptional” by proving that the imposed sentence is not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. We have carefully reviewed all of the evidence in this record pertaining to the defendant’s mental capabilities and his actions relative to the offense, and we find that the defendant has failed to carry his burden of proof.
In his statement to the police, the defendant — who was only days away from his 23rd birthday — insisted that, even though the victim was shot |7twice, he did not intend to shoot him. He maintained that he only wanted to rob the store. After the victim gave him the money from the cash register, he then demanded that the victim go to the safe. According to the defendant, his “hand was on the trigger” and “the gun went off.” He said he was “trip-pin” and not in his “right mind.” However, he denied drug use. He initially lied to the police, stating that the gun belonged to a friend and that he threw it in the river. However, when confronted with information obtained from his family, he admitted that the gun was stolen from his stepfather and that he had hidden it in the backyard. He also stated that he had gotten rid of the clothes he wore during the offense. He first claimed to have thrown them in a dumpster but later asserted that he burned them.
Pursuant to their appointments to the sanity commission, Drs. Seiden and Williams, both of whom are psychiatrists, interviewed the defendant and submitted reports to the court. These reports were introduced as exhibits at the defendant’s sentencing proceeding. Both doctors reached the same conclusions — that the defendant was currently able to consult with counsel and understood the proceedings and that, at the time of the offense, he was not suffering from any major mental disorder that interfered with his ability to distinguish between right and wrong. The reports indicate that the interviews were conducted on the same day. However, the defendant gave significantly different accounts to the doctors.
Dr. Seiden stated that the defendant claimed he “wasn’t in [his] right mind” and *405 “was on a lot of drugs at the time” of the murder. Specifically, he claimed to have ingested cocaine, marijuana and alcohol. While he admitted to Dr. Seiden that he recalled trying to rob the victim, he said he did not understand why he shot him. The defendant stated that he “killed a guy.” |sHe said he went in the store to use the restroom, came back out, “[t]he guy was shot,” and then he walked out of the store. He admitted that he had been arrested about eight times and that his first arrest was at age 12 for a sexual battery of a six-year-old girl. He stated that his first adult arrest was a theft charge at age 20. He reported a work history of employment in fast food restaurants, including one job which lasted a year. He denied ever being fired. The defendant also told Dr. Seiden that the robbery was motivated by the need for money due to the impending birth of his son. According to Dr. Seiden, the defendant’s affect was subdued during the evaluation and his intelligence appeared to be “somewhat below average.”
During his interview with Dr. Williams, the defendant recounted that he went to the store to buy cigarettes, that the victim sold him some, and that the victim “must have died after I left the gas station.” He claimed that he did not know how the man was killed. He admitted to approximately eight prior arrests, including theft and sexual battery. He stated that his longest incarceration was seven years between the ages of 12 and 19. He described his work history at various fast food restaurants. He also recounted using marijuana, cocaine and alcohol on the day of the murder. Dr. Williams opined that the defendant was “trying to malinger a lesser state of cognitive functioning.” The doctor noted that the defendant “put out decreased effort, and attempted to not answer questions throughout the interview.” His affect was “constricted” with a “mood of disinterest or indifference.” Dr. Williams found his intelligence to be “borderline' to above” and his “hypothetical judgment was impaired, but also consistent with lack of cooperation.”
After reviewing the May 2014 reports of the doctors on the sanity commission, the trial court found that each doctor concluded that the |3defendant had the ability to consult with counsel with a reasonable degree of rational understanding and that he had a rational and factual understanding of the proceedings against him. Based upon the doctors’ findings, the court found that the defendant was competent to assist counsel and stand trial.
Dr. McCormick, the psychologist engaged by the defense to review the defendant’s school records, never interviewed the defendant. Consequently, he could comment on the defendant’s test scores only in general terms. According to the records, the defendant was discovered to have mental disabilities at age five. At age eight, his overall IQ score was 45, which placed him in the range of moderate mental retardation. At age 11, his overall IQ score was 46. While a report for a test administered in 2007, when the defendant was 16 years old, did not give IQ scores, Dr. McCormick stated that the results were in line with his prior testing. Using an IQ of about 50 and the idea that mental age tops out at age 18, Dr. McCormick opined that the defendant had the mental age of a nine-year-old child. However, he conceded that the test data suggested that the defendant fell in the higher part of the moderate mental retardation range. The doctor also admitted that he had not viewed the video of the murder and that the audio recording of it he was given was not helpful.
The devastating surveillance video from the store, which recorded all of the events surrounding this senseless murder, was *406 admitted into evidence at the sentencing proceeding. It shows that the young store clerk never made any effort to resist the defendant and that he swiftly complied with the gun-wielding defendant’s demand for the money in the cash register. After obtaining this money, the defendant tells the victim to go to the safe, which was under the counter. Although the audio on the video recording is | insomewhat difficult to understand, it is apparent from the gestur'es made that the clerk was unable to open the safe. At this point, the defendant shot the victim in the head. As the victim fell to the floor, the defendant shot him again, this time in the back. The defendant then fled the store. The helpless victim is shown lying motionless on the floor behind the counter as unsuspecting customers later entered the store and began looking around for an attendant to ring up their purchases.
Our statutory law and. jurisprudence do not prohibit the imposition of a life sentence without parole upon a mentally retarded murderer. Furthermore, the record before us offers no support for the proposition that this particular mentally retarded defendant should be exempt from the legislatively imposed sanctions for his crime. He apparently acted alone and was not being influenced by any other perpetrators. His actions before, during, and after the murder demonstrated a significant degree of deliberate thought and planning. The defendant had the foresight to surreptitiously obtain his stepfather’s gun and the ability to successfully complete the robbery without assistance. He then cold-bloodedly shot the victim twice— first in the head and then in the back as the defenseless young man fell to the floor. Afterwards, he had the presence of mind to get rid of the clothes he was wearing and hide the gun. When speaking to the police, he had sufficient awareness to initially spin elaborate lies about where he obtained the gun and how he disposed of it and to falsely describe the shooting as accidental. We further note from the PSI report prepared for the trial court that, at the time of the murder, the defendant was on probation for attempted felony theft. He had originally been arrested for purse snatching. His ^probation was revoked. He also had several other arrests for misdemeanors committed as an adult.
Based on the foregoing, we find that the trial court clearly did not abuse its discretion in imposing the mandatory life sentence without benefit of parole, probation, or suspension of sentence. The callous and utterly senseless murder of the victim outweighs any argument for leniency for this defendant due to his mental condition.
■ERROR PATENT
Our error patent review reveals that the trial court did not properly advise the defendant of the prescriptive period for seeking post-conviction relief, as required by La. C. Cr. P. art. 930.8(C). Therefore, we advise the defendant, by way of this opinion, that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922.
CONCLUSION
The defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Graham, supra, held that the Eight Amendment prohibited imposition of a life without parole sentence on a juvenile offender in a non-homicide case.