STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

15-392

STATE OF LOUISIANA

VERSUS

MANZY C. WATSON a/k/a
MANZY LASHAWN WATSON

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 30173-12
HONORABLE RONALD F. WARE, DISTRICT JUDGE

************

JAMES T. GENOVESE
JUDGE

************

Court composed of Sylvia R. Cooks, James T. Genovese, and John E. Conery, Judges.

**AFFIRMED.**

William R. Thornton
Louisiana Appellate Project
Post Office Box 51992
Lafayette, Louisiana 70505-1992
(337) 534-4656
COUNSEL FOR DEFENDANT/APPELLANT:
      Manzy C. Watson a/k/a Manzy LaShawn Watson


John F. DeRosier
District Attorney—Fourteenth Judicial District
Karen C. McLellan
Assistant District Attorney
901 Lakeshore Drive, Suite 800
Lake Charles, Louisiana 70601
(337) 437-3400
COUNSEL FOR APPELLEE:
      State of Louisiana

**GENOVESE, Judge.**

In this criminal case, Defendant, Manzy C. Watson,[1] appeals his conviction of second degree murder, alleging insufficiency of the evidence, excessive sentence, and trial court error as to his waiver of trial by jury. For the following reasons, we affirm Defendant's conviction and sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

After a day of arguing with her over finances, in the early morning hours of August 20, 2012, Defendant went to the home of Dorothy Horsman, his girlfriend. Thereafter, the argument resumed, and Defendant stabbed Ms. Horsman twelve times with a kitchen knife, mostly in the upper neck and chest area. He also stabbed Ms. Horsman's son in one arm as the boy was attempting to defend himself. Ms. Horsman died shortly thereafter as a result of her stab wounds.

Subsequent thereto, Defendant was indicted for the second degree murder of Dorothy Horsman, a violation of La.R.S. 14:30.1, and for the attempted second degree murder of her son, Zechariah Jones, violations of La.R.S. 14:27 and 14:30.1. On September 13, 2012, Defendant filed a "Motion to Appoint Sanity Commission," which was granted by the trial court. A sanity commission hearing was held on November 21, 2012, whereupon Defendant was found capable of assisting in his defense at trial. Following the sanity hearing, Defendant pled not guilty and not guilty by reason of insanity. On April 29, 2014, a second sanity commission was appointed, and, again, Defendant was found to be capable of proceeding to trial.

---

[1]While the indictment lists Defendant's name as "Manzy C. Watson," documents included in the appellate record indicate that Defendant's middle name is "LaShawn."

After Defendant signed and submitted to the trial court a written waiver of trial by jury, a bench trial commenced on October 6, 2014, following which the trial court found Defendant guilty of second degree murder. The trial court also found that there was insufficient evidence to sustain a verdict of attempted second degree murder, but found Defendant guilty of the lesser included offense of aggravated battery, a violation of La.R.S. 14:34.

Defendant was sentenced on October 29, 2014, to life imprisonment for the murder of Ms. Horsman and to ten years imprisonment for the aggravated battery of Mr. Jones. The sentences were ordered to be served concurrently with credit for time served. Defendant did not file a motion to reconsider the sentences. Defendant has only appealed his second degree murder conviction and sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENTS OF ERROR

For our consideration and review, Defendant sets forth the following assignments of error:

1. The State failed to prove that the Defendant committed the crime alleged, beyond a reasonable doubt, because no rational fact-finder could have found the Defendant guilty of second degree murder, rather than manslaughter, based on the evidence adduced at trial.

2. The trial judge erred during sentencing[] when he stated that he had no alternative to sentencing the Defendant to life imprisonment for his conviction on second degree murder, thereby failing to determine whether the imposition of such sentence was not constitutionally excessive in the Defendant's case.

3. The trial court failed to determine whether the Defendant knowingly and intelligently waived his right to trial by jury,

particularly in light of the Defendant's documented mental condition and his plea of not guilty and not guilty by reason of insanity.

## *ASSIGNMENT OF ERROR NUMBER ONE*

Defendant does not challenge the trial court's ruling that he was not insane at the time the offenses were committed or the conviction for aggravated battery. However, he argues that the trial court erred in finding him guilty of the second degree murder of Ms. Horsman. While admitting that he stabbed Ms. Horsman, he contends he was guilty of the lesser offense of manslaughter for the reason that he acted out in sudden passion or heat of blood immediately caused by provocation sufficient to deprive him of his self-control and cool reflection.

Second degree murder is defined as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent to kill or inflict great bodily harm may be inferred from "the extent and severity of the victim's injuries." *State v. Patterson*, 10-415, p. 11 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037.

Manslaughter is defined as:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31(A).

3

> While 'sudden passion' and 'heat of blood' are mitigating factors to a charge of murder, an accused need only establish the mitigating factors by a preponderance of the evidence. *State v. Fontenot*, 05-553 (La.App. 3 Cir. 12/30/05), 918 So.2d 1096; *State v. Baldwin*, 96-1660 (La.12/12/97), 705 So.2d 1076, *cert. denied*, 525 U.S. 831, 119 S.Ct. 84, 142 L.Ed.2d 66 (1998).

*State v. Johnson*, 06-1263, p. 14 (La.App. 3 Cir. 2/7/07), 948 So.2d 1229, 1237, *writs denied*, 07-467, 07-509 (La. 10/12/07), 965 So.2d 398, 399. In reviewing an accused's claim that he has met his burden of proof, an appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors had not been established by a preponderance of the evidence. *State v. Robinson*, 32,794 (La.App. 2 Cir. 3/1/00), 754 So.2d 311, *writ denied*, 00-989 (La. 3/23/01), 787 So.2d 1008.

Mr. Jones, one of the victims in this case, was twenty-two years of age at the time of trial and testified that he and his younger brother, David Horsman, lived with their mother, Dorothy Horsman, on Legion Street in Lake Charles, Louisiana. He further testified that his mother met Defendant through a dating website on the internet. He stated that Defendant, who had been living at the Salvation Army in Lafayette, had moved in with his mother in April 2012. On the day before the incident, Defendant, who worked for a temporary job agency, had come home from work about 5:00 p.m. with a six-pack of beer. Mr. Jones testified that Defendant and his mother immediately started arguing about money. He stated that disagreements as to household finances were common between the couple. Wanting to stay out of the argument, Mr. Jones took his little brother, David, with him and went outside to do yard work. About 6:30 p.m., Defendant left the house

4

and went across the street to some friends' house. He came back later, and the arguing continued until he "stormed" out and went back across the street.

Mr. Jones testified that he, his mother, and his brother watched television for the rest of the evening. Later on, around midnight, his mother told him to put a metal chair against the front door doorknob and asked him to sleep in the living room in case Defendant tried to get back into the house. He described her as being "scared-ish." She then went into her bedroom. Around two in the morning, Mr. Jones checked all the doors and windows to be sure they were locked and went into his bedroom. About an hour later, Defendant burst into his bedroom, yelling and waiving a knife. Mr. Jones said Defendant was making stabbing motions. He raised his arm to ward off Defendant and received a stab wound on his arm. He said that Defendant then turned and moved towards his brother, who had also been asleep. Mr. Jones ran towards Defendant to stop him, but Defendant turned, ran out of the room, dropped the knife, and left out of the front door.

Mr. Jones then noticed his mother stumbling down the hallway. She was bleeding profusely. He helped her into a chair, where she slumped forward. She was moaning and gasping for air. He yelled for his brother to call 911 and tried to stop the flow of blood from his mother's neck. He held her until the police arrived.

Mr. Jones testified that when Defendant first moved in, they "hit it off." However, things later became stressful because there was very little money in the household. He related that his mother had injured herself a year prior and was unable to work. She was mostly bedridden and heavily on pain medication. Mr. Jones said that Defendant was not contributing much money to the household and that his mother had to borrow money to pay the bills. He stated that his mother and Defendant often argued and that Defendant would threaten her when they

argued.  When asked if he heard the threats, Mr. Jones answered, "I - - I heard - - well, they - - they were text messages from him."  He did not elaborate as to what the "threats" were.  Finally, Mr. Jones testified that he did not know how Defendant got into the house.  He said that the metal chair had been pulled away from the front door.

John Loftin, a corporal with the Lake Charles Police Department, testified that he was contacted in the early morning of August 20, 2010, told to go to the hospital to speak with Ms. Horsman; however, she died shortly after he arrived.  He then spoke with her son, Mr. Jones, who informed him that his mother was pregnant, but he did not know how far along she was.  Corporal Loftin described a note written by Ms. Horsman that Defendant had in his possession at the time he was apprehended which mentioned something about Defendant not loving her or the baby.  He later learned through the autopsy report that Ms. Horsman had had a tubal ligation and was not pregnant at the time she died.  He testified that Defendant was arrested the next morning when he went to the job agency to pick up his check.  At the time of his arrest, Defendant was dressed in a bloody t-shirt and shorts and was barefoot.

Though Defendant did not testify at trial, the State introduced his taped interrogation conducted during the morning after he was arrested.  The tape indicates that Defendant was cleaned up and in an orange jail jumpsuit.  He appeared clean-cut, very calm, and very polite.  He stated that he was working and paying utilities; however, he said that Ms. Horsman wanted him to start paying fifteen dollars a day for staying with her.  He said that when he came home from work on August 19, 2012, around 5:00 p.m., all his stuff was thrown out onto the front lawn and that she was fussing at him.  He said that he left and went across the

6

street to the neighbor's house and had a few beers. He went back to Ms. Horsman's house later on, and she was still fussing, so he left again and went to the beach with the neighbor.

Defendant said that he got back home around 2:00 a.m. Even though he had a key to the back door, he knocked at the front door, and she let him in. He said that after she threw all of his stuff outside, he asked her if she wanted him to leave, and she said no. When he got home that morning, all his stuff was back inside the house, but in bags in the living room. The arguing recommenced immediately. He said that she was calling him all kinds of names, including the "N" word. He stated that she walked into the kitchen and grabbed a knife. After he kicked the knife out of her hand, she ran into her bedroom. He picked up the knife and followed her and began to stab her. When asked if she had hurt him with the knife, he said that he had a little scratch on his hand, but thought the scratch was from her fingernail. At first, he said he did not remember much, but then he described how he only tapped her with the knife a few times and did not really look at her. He described how she laid on the bed with her legs up. She began calling out for her sons. He said the boys came out of their room and tackled him. He did not know what happened to the knife. He denied that he went into the boys' room and denied that he stabbed Mr. Jones. Defendant insisted he was going to turn himself in to the police that morning as soon as he got himself something to eat.

Defendant stated that he knew Ms. Horsman was pregnant, but did not think the baby was his because they had only been together for six months, and he believed she was about eight months pregnant. He stated he had decided that morning to leave Ms. Horsman, but he would have loved the baby as his own as he loved both Mr. Jones and David. Defendant said that he had a thirteen-year-old

7

son whom he supported and that was where most of his money went. Even though the interviewers told him they were investigating a homicide at the start of the interview, Defendant seemingly did not realize that Ms. Horsman had died. He broke down when told of her death and sobbed. He claimed he deserved to spend the rest of his life in prison for what he had done. He agreed that their arguments sometimes got physical.

Testimony established that Ms. Horsman had been stabbed twelve times, mostly in the neck and chest area. One stab wound punctured her lung, and she was bleeding into the lung. There was one stab wound in her hand which penetrated all the way through the palm. A toxicology report showed barbiturates and opiates in her blood, which were consistent with pain medication.

Diane Daniel, Defendant's mother, testified that when Defendant was in his twenties, he was examined for mental health problems. She stated he was diagnosed with a schizophrenic bipolar condition. He was treated at Tyler Mental Health Center in Lafayette. She stated, however, that he was never violent and that he ran away from any kind of confrontation most of the time. She said he always worked and could manage money.

Defendant's older brother, Jonathan Watson, corroborated his mother's testimony. He added that Defendant would seem to do good at times, and then he would just leave everything behind. He said Defendant was easily manipulated, naive, gullible, and would get help for a while, then would quit taking his medication. He stated that as a child, Defendant would have temper tantrums, but was never violent.

Defendant also introduced a portion of the July 16, 2014 sanity hearing transcript regarding Dr. Patrick Hayes' determination of his mental status. The

8

doctor, a board certified psychiatrist, did not agree that Defendant suffered from schizophrenia. He had diagnosed Defendant as having schizotypal personality disorder with post-traumatic stress and a social avoidance disorder. He explained schizotypal personality disorder as follows:

> [A] little bit odd beliefs, a little bit idiosyncratic, a little bit magical, a little bit socially avoidant. So, what I would predict, given that recipe, is under duress, he would be a little bit more socially avoidant, a little bit more odd, a little bit more magically-thinking, which we saw - - this sort of addresses - - your question gets to - - if you'll look back at the historical record in 2005 when there was a lot of social adversity, when there was a lot of personal and psychological adversity, his response was to deteriorate. He probably became medically depressed at that time, met the full threshold criteria for major depressive episode, and it had some transient rapidly shifting complaints to the clinical team of feeling like he could stop time, or he could control other's thoughts. That's the sort of thing you would expect to see from that particular recipe. And it's what, in fact, we've seen with Mr. Watson.

The doctor further stated that the disorder "is not something we classically associate with any sort of violence; however, it's more socially avoidant."

After discussing the issue of whether Defendant was insane at the time of the offense, which the trial court concluded he was not, the trial court stated for the record, as follows:

> Mr. Watson showed a real sense of composure during the videotaped interview some eleven hours after the events which bring us here. He was calm, coherent, polite, and articulate and able to recall with a fair degree of accuracy most of the events - - most of the prior events. And[,] he was obviously not psychotic at the time of the interview, being that he was out of touch with reality.
>
> The observations are quite clear from the videotaped statement that Mr. Watson enjoyed a reasonable level of coherency, and that did not - - in fact, it militated against a finding of insanity.
>
> During the interview he said things got out of control. It shouldn't have gone that far. After she ran into the bedroom, the rest is on me.

9

All of those statements and others clearly indicated that he had a very real consciousness of guilt or having done something wrong.

Also what he did after stabbing Ms. Horsman and her son, he left and did not go back as he had done earlier. This[,] too[,] is evidence of consciousness of guilt[].

Now, as to the sufficiency of the evidence with respect to the charged offenses, I find that the State of Louisiana did establish Manzy Watson's guilt of second-degree murder.

I don't think manslaughter is an appropriate verdict in this case under either suggestion made by defense counsel. First, I don't find that there was the requisite provocation on Ms. Horsman's part sufficient to deprive an average person of their self-control or cool reflection. Ms. Horsman, even though she grabbed the knife first[,] made it very clear when she left the kitchen she wanted to disengage from the verbal confrontation most likely to avoid it escalating into a physical altercation, which it did. Ms. Horsman did not attack Mr. Watson with the knife or even swing it at him, as far as the evidence reveals. Even if Mr. Watson felt threatened by Ms. Horsman, the threat ended when he disarmed her and she went into the bedroom. There was no struggle or fight in the kitchen where either there was a - - a struggle for the knife. That never happened. When she was disarmed, she went into her bedroom. And, in other words, she fled. Mr. Watson was no longer in danger and could have left again, as he did earlier. Instead he armed himself and pursued her into the bedroom. After becoming enraged due to the totality of the circumstances, which included being called derisive names, he took the situation to another level, overreacted. As he said, things got out woefully out of control.

As to the State proving specific intent, the State has to show either the specific intent to kill or to inflict great bodily harm. The State has made such a showing beyond a reasonable doubt. The number of times Ms. Horsman was stabbed with a large knife to the extent it bent[,] and the manner in which she was injured while in a defensive posture[,] and the severity and extent to which she was injured all support a finding of at least the specific intent to inflict great bodily harm, which she was and ultimately died from the injuries and wounds sustained during the attack.

Defendant appends his argument to the statement made by the trial court during the above recitation: "After becoming enraged due to the totality of the circumstances, which included being called derisive names, he took the situation to another level, overreacted. As he said, things got out woefully out of control."

Defendant argues this is the "exact mitigating factors necessary to support a verdict of manslaughter[.]" Defendant cites *State v. Bryan*, 454 So.2d 1297 (La.App. 3 Cir.), *writ denied*, 458 So.2d 128 (La.1984), wherein this court reduced a second degree murder conviction to manslaughter, to support his contention that his actions constituted manslaughter instead of second degree murder. Defendant asserts that the facts of *Bryan* are similar to the current case.

In *Bryan*, three sailing vessel crew members, Ross, Thompson, and Bryan, had been in town drinking all day. Later, they continued their drinking binge in the galley of one of the vessels, drinking shots of whiskey with beer chasers. Thompson suddenly grabbed a large butcher knife and pushed Ross and Bryan into a corner. He continued to threaten them, thrusting the knife at them for several minutes. Bryan attempted to take the knife from Thompson but received a cut on his hand. Thompson then walked out of the galley with the knife. Ross also left the galley. About a minute later, Thompson came back into the galley. There was no evidence that Thompson still had the butcher knife. However, Bryan had armed himself with a small knife. A fight ensued, and Thompson was cut on the neck and subsequently bled out and died. Bryan was charged with second degree murder. There were no witnesses to the fight. With these facts, this court concluded:

> As was stated before, the evidence clearly shows that this entire incident was provoked by the victim. Robert Lee Ross, the only eyewitness to the original altercation, felt that Thompson was merely "playing around" when he backed the two men into the corner with a huge butcher knife. The defendant, however, had known the victim for only two weeks and had no objective signs which would indicate to them that the victim was only acting in jest.
>
> When a person is backed into a corner at knife point and must repeatedly avoid the thrust of a huge knife, and where there is no objective signs to indicate that the aggressor is acting in jest, we feel that the ordinary person would have cause for apprehension and would likely take reasonable steps to protect himself. Although we

11

> have already concluded that the steps taken by the defendant were not reasonable, we do find that the circumstances were such that there was a sufficient provocation to deprive an average person of his self-control and cool reflection. We find that the defendant acted in sudden passion or heat of blood in the killing of Jeff Thompson, and that no rational trier of fact could have concluded otherwise. This view is reinforced by the fact that there had been no prior history of trouble between the two men, which makes this Court hard pressed to find any motive for the killing other than a reaction to the provocation of the victim.

*Id.* at 1300-01 (footnote omitted).

We find the facts in *Bryan* are readily distinguishable from the current case. Unlike in *Bryan*, although Ms. Horsman grabbed the knife first, according to Defendant, she did not actively threaten him, and he promptly kicked it out of her hand. He picked up the knife and followed her when she retreated to her bedroom. Defendant agreed during the police interview that there had been some physical interaction between them in the past. Furthermore, again unlike *Bryan*, the problem between the couple had been ongoing for at least a few months and was no real surprise. Generally, arguments do not suffice to reduce a murder to manslaughter. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, *writ denied*, 98-3119 (La. 5/14/99), 741 So.2d 659. Additionally, while he stated she called him all kinds of terrible names, including the "N" word, "[m]ere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter." *State v. Mitchell*, 39,202, p. 12 (La.App. 2 Cir. 12/15/04), 889 So.2d 1257, 1263, *writ denied*, 05-132 (La. 4/29/05), 901 So.2d 1063.

We find that Defendant failed to prove, by a preponderance of the evidence, the factors necessary to mitigate the offense of second degree murder to manslaughter. While Defendant stated that the victim grabbed the knife first, he did not indicate that he was threatened by the victim. The victim's son testified

12

that his mother was largely bedridden and often had to be helped just to get around the house. Although there had been hours of arguments, broken up by Defendant leaving the house to cool off and returning, along with name calling, the victim's acts immediately prior to the stabbing were not sufficiently provocative to cause an average person to lose his self-control and cool reflection. Additionally, after the encounter with the knife, Ms. Horsman retreated to her bedroom. At that time, Defendant was not in any danger or under any further attack, yet he grabbed the knife, followed her into the bedroom, and stabbed her twelve times. Accordingly, we affirm Defendant's conviction of second degree murder.

## *ASSIGNMENT OF ERROR NUMBER TWO*

Defendant asserts that the trial court erred when it failed to consider whether the mandatory life sentence for second degree murder was constitutional in his case. He argues that at the sentencing hearing, the trial court noted that it had no choice but to sentence Defendant to life imprisonment. He contends that pursuant to *State v. Dorthey*, 623 So.2d 1276 (La.1993), the trial court had a duty to determine whether the sentence was excessive.

Initially, we note that while Defendant objected to the sentence following the sentencing hearing, he did not state a ground for the objection, nor did he file a motion to reconsider the sentence. Therefore, this court is precluded from reviewing his sentence. Pursuant to La.Code Crim.P. art. 881.1(E):

> Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

13

Additionally, in *State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356, the defendant failed to object to the sentence imposed at the sentencing hearing and did not timely file a motion to reconsider sentence. This court found his claim of excessiveness of sentence was barred. *See also State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59.

We are cognizant of the fact that this court has reviewed claims of excessiveness where no objection was made and no motion to reconsider sentence was filed. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, 09-606 (La. 12/18/09), 23 So.3d 936; *State v. Quinn*, 09-1382 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, *writ denied*, 10-1355 (La. 1/7/11), 52 So.3d 885.

However, in the current case, we find that a review of the life sentence in this case is not warranted. Louisiana Revised Statutes 14:30.1 provides that the punishment for second degree murder is life imprisonment without the benefit of parole, probation, or suspension of sentence. Quoting *State v. Williams*, 445 So.2d 1264, 1269 (La.App. 3 Cir.), *writ denied*, 449 So.2d 1346 (La.1984), the State in the instant case noted that "[i]t is 'an exercise in futility' for a trial court to consider sentencing factors when imposing a mandatory sentence when the trial court [has] no discretion in sentencing a defendant." Moreover, while discussing the possibility of a downward departure from a mandatory life sentence for second degree murder, in *State v. Runyon*, 05-36, p. 33 (La.App. 3 Cir. 11/2/05), 916

So.2d 407, 429-30, *writ denied*, 06-1348 (La. 9/1/06), 936 So.2d 207, and *writ denied*, 06-667 (La. 11/17/06), 942 So.2d 526, this court noted:

> Citing *State v. Dorthey*, 623 So.2d 1276 (La.1993), and *State v. Sepulvado*, 367 So.2d 762 (La.1979), he contends that his mandatory life sentence for a second-degree murder conviction is too severe and that he should either be resentenced or a more appropriate sentence should be imposed by this court.
>
> In *State v. Paddio*, 02-722, pp. 16-17 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1131, *writ denied,* 03-402 (La.2/13/04), 867 So.2d 682 (citations omitted), this court discussed the imposition of life sentences under La.R.S. 14:30.1, stating:
>
>> [A] court may depart from a minimum sentence only if it finds that there is clear and convincing evidence that rebuts the presumption of constitutionality. To rebut the presumption, a defendant must show, by clear and convincing evidence, that, "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case."
>
> Defendant McDonald set forth no mitigating reasons why his sentence is cruel, unusual, or too severe. He makes no attempt to set forth unusual circumstances that rebut the presumption of constitutionality; thus he has failed to meet his burden of proof on this point. The gravity of the offense merits the punishment prescribed by the legislature, and Defendant McDonald makes no showing to the contrary.

*See also State v. Ross*, 03-564 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, *writ denied*, 04-376 (La. 6/25/04), 876 So.2d 829.

Accordingly, it is incumbent upon Defendant to raise the question of whether the mandatory life sentence for the offense of second degree murder was inappropriate in his case. This, he did not do. There was no discussion at the sentencing hearing regarding such a concern, nor did Defendant raise it in a motion to reconsider the sentence. Therefore, there is no merit to this assignment of error.

*ASSIGNMENT OF ERROR NUMBER THREE*

Defendant argues that the trial court failed to adequately determine that he knowingly and intelligently waived his right to a jury trial. Although Defendant signed a written waiver, he contends that because he pled not guilty and not guilty by reason of insanity and had had two sanity commission hearings, the trial court should have personally addressed the right to a jury trial as opposed to a bench trial.

In *State v. Howard*, 10-869, pp. 6-7 (La.App. 5 Cir. 5/24/11), 66 So.3d 1160, 1165, *writ denied*, 11-1468 (La. 4/9/12), 85 So.3d 135, the fifth circuit reiterated the principles applicable to a defendant's waiver of his or her right to a jury trial, stating:

> Although the right to a jury trial may be waived in non-capital cases, it must be "knowingly and intelligently" waived. LSA-C.Cr.P. art. 780 A. Waiver of this right is never presumed. *State v. McCarroll*, 337 So.2d 475, 480 (La.1976); *State v. Zeringue*, 03-697 (La.App. 5 Cir. 11/25/03), 862 So.2d 186, 193, *writ denied*, 03-3523 (La.4/23/04), 870 So.2d 298. Although it remains the preferred method for the district court to advise a defendant of the right to a jury trial in open court before obtaining a waiver, that practice is not statutorily required. *State v. Pierre*, 02-2665 (La.3/28/03), 842 So.2d 321 (per curiam); *State v. Lokey*, 04-616 (La.App. 5 Cir. 11/30/04), 889 So.2d 1151, 1154, *writ denied*, 04-3195 (La.5/6/05), 901 So.2d 1093. It is likewise preferred, but not necessary, for the defendant to waive the right to a jury trial personally. *Id*. Counsel may waive the right on the defendant's behalf, provided the defendant's decision to do so was made knowingly and intelligently. *Id*.

In the current case, on August 15, 2014, Defendant filed a "Motion to Waive Trial by Jury," which stated:

> Andrew M. Casanave, attorney for MANZY LASHAWN WATSON, defendant in the above captioned case, upon consideration and consultation together, waive Defendant's right to a trial by jury in this case.

MANZY LASHAWN WATSON, defendant, further states that he fully understands his right to a trial by jury and thus waives his right knowingly, voluntarily, and intelligently.

The waiver was signed by both defense counsel and Defendant.

Defendant argues that he has a lengthy history of mental problems, which should have alerted the trial court to his lack of understanding of the legal process. He points out that at the November 21, 2012 sanity commission hearing, Dr. James Anderson, a psychiatrist, testified that Defendant "indicated that he didn't know what the function of a jury was." However, preceding this comment, the doctor testified that "I noted that he was somewhat guarded and evasive, and gave what I would call some inappropriate answers to some questions that were inconsistent with what I felt his fund of knowledge should be." Furthermore, at the July 16, 2014 sanity commission hearing, a month prior to Defendant signing the motion to waive a jury trial, Dr. Patrick Hayes testified regarding Defendant's ability to proceed to trial. While the issue of a jury trial was not discussed at the hearing, Dr. Hayes' report, which was submitted to the trial court, stated, in pertinent part, the following:

7. Can he/she understand his/her "legal rights"?

A. Right to choose between trial by jury or trial by judge. **YES**, "I'd rather have a trial by judge. . .look at me. . .it's a racial issue," and he vocalizes his argument that a trial by jury would be riskier to him due to apparent racial concerns in his case than a judge-only trial. Whether or not his statement is factual or accurate, his argument is logical, coherent, goal directed, and preference-based, and it expresses an understanding of the process and the nature of potential risks of peer-based jury decisions.

Additionally, Dr. Anderson's June 2, 2014 report, which was also submitted to the trial court on July 16, 2014, stated:

Mr. Watson was cooperative with the interview process. He responded to questions correctly and in a logical, organized and goal

17

directed manner. He understands that he is charged with "second degree murder and attempted second degree murder." He understands that these are "major charges, felonies," and[,] if convicted[,] he could be sentenced to "it could be two life sentences (in) Angola." He understands the function of a *judge* ("Hands out the verdict... Final decision (re.) guilty or innocent... Give you some time."), a *jury* ("Discuss the facts and determine innocent or guilty, and how much time."), and *witnesses* ("Testify against you (or) with me... What they seen and witnessed."). He understands that the *defense attorney* "is with me." His job is "to work for me." The *prosecuting attorney's* job is "nailing me." He is "working against me." He also understands that he is the defendant in this case.

These reports were submitted to the trial court in July 2014, one month prior to Defendant requesting a trial by the judge and two months prior to commencement of the trial. Undoubtedly, the motion to waive jury trial came as no surprise to the trial court. *See State v. Smith*, 447 So.2d 4 (La.App. 3 Cir. 1984) and *State v. Parker*, 416 So.2d 545 (La.1982)).

The record before this court supports Defendant's knowing and intelligent choice to have a judge trial as opposed to a jury trial. Defendant did not state that he was not advised of his right to a jury trial. As noted above, he expressed concern because he was a black man and the victim was a white woman, and he believed he would have a fairer trial with a judge sorting through the facts of the case. Further, there is nothing in the record before this court to indicate Defendant's mental health issues interfered with his understanding of the legal process. Thus, there is no merit to this assignment of error.

**DISPOSITION**

We find that the State proved that Defendant committed second degree murder beyond a reasonable doubt and that he failed to prove, by a preponderance of the evidence, the factors necessary to mitigate the offense of second degree murder to manslaughter. We also find no error in the trial court's alleged failure to

18

determine whether the imposition of Defendant's sentence was constitutionally excessive, as same was not warranted based on the record in this case. Finally, we find no error in the trial court's ruling that Defendant knowingly and intelligently waived his right to trial by jury. Accordingly, we affirm Defendant's second degree murder conviction and sentence.

**AFFIRMED.**