STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**18-974**


STATE OF LOUISIANA

VERSUS

DANIEL HEATH KIGHT


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 27166-14
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Candyce G. Perret, and Jonathan W. Perry, Judges.


**AFFIRMED.**

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602-1747**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
    **Daniel Heath Kight**

**John F. DeRosier**
**District Attorney**
**Charles Robinson**
**Assistant District Attorney**
**Shelley A. DeVille**
**Assistant District Attorney**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana  70601**
**(337) 437-3400**
**Counsel for Appellee:**
     **State of Louisiana**

**PERRY, Judge.**

Daniel Heath Kight ("Defendant") appeals his mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence for the second degree murder of David Scasino ("Scasino"). For reasons which follow, we affirm Defendant's sentence.[1]

## FACTS AND PROCEDURE

Scasino and Defendant, who were friends, had trailer homes next to each other in Vinton, Louisiana. On the morning of September 22, 2014, Scasino was found dead in his trailer home by Mark Kidder, a neighbor and friend. The Calcasieu Parish Coroner's report showed Scasino suffered multiple stab wounds and cuts to the head, neck, abdomen, back, buttocks, and both upper and lower extremities; his injuries led to the severing of both carotid arteries, a hole in his lung, and four holes in his liver. The Coroner also found Scasino's chest was cut open from the neck to his genitalia, and his testicles were removed and placed next to his body; these injuries were inflicted post-mortem.

The Vinton police arrested Defendant, and a grand jury indicted him with the second degree murder of Scasino. Between Defendant's arrest and his bench trial, on February 14, 2018, multiple sanity and competency panels examined Defendant; all concluded he was competent to proceed to trial and that he was sane at the time of the offense. Defendant entered a plea of not guilty and not guilty by reason of insanity and waived his right to a jury trial. After a four-day bench trial in which two psychiatrists and one psychologist, the former two for the State and the latter for Defendant, testified about Defendant's mental health history and the status of his

---

[1] Defendant has not appealed the trial court's determination of his guilt or the rejection of his plea of not guilty by reason of insanity.

sanity at the time of the murder, the trial judge found Defendant guilty as charged and rejected his plea of not guilty by reason of insanity.

On March 26, 2018, the trial judge, applying the mandatory sentencing provisions of La.R.S. 14:30.1(B), imposed a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence.[2] The sentencing colloquy is quoted below:

> [I]t could be very problematic for Daniel to be in [the] regular population at Angola or . . . probably a lot of other state facilities. Based on what I have heard up to this point, and based on the conviction I am sentencing him to life in prison without benefit of probation, parole or suspension of sentence . . . . However, I want it emphatically stated in the sentence that I am recommending that the state make every effort to place him in an appropriate facility based on his limitations and his medical condition. And I'll do whatever I can to make that happen.

Defendant now raises two assignments of error, namely: (1) The imposition of the mandatory life sentence without benefit of parole, probation, or suspension of sentence violates the Eighth Amendment of the U.S. Constitution and La.Const. art. 1, § 20, as it is nothing more than cruel and unusual punishment and, thus, excessive; and (2) Defendant received assistance of counsel below that guaranteed by the Sixth Amendment during the sentencing phase, as counsel failed in three instances: (a) counsel failed to argue and present evidence to establish that Defendant was "exceptional" and deserving of a downward departure from the mandatory life

---

[2] Although the sentencing judge mentioned that it would be difficult if Defendant were placed in the regular population at Angola, he did not mention hard labor or the Department of Corrections when he imposed Defendant's sentence without benefit of probation, parole or suspension of sentence. Notwithstanding, the court minutes indicate Defendant's sentence was to be served in the Louisiana Department of Corrections, necessarily at hard labor.

If a discrepancy exists between the commitment and the transcript, the transcript prevails. *State v. Lynch*, 441 So.2d 732 (La.1983). Louisiana Code of Criminal Procedure Article 879 requires a court to impose a determinate sentence. If there were some discretion allowed by the applicable sentencing statute, the failure to indicate whether the sentence was to be served at "hard labor" would be an impermissible indeterminate sentence. However, because Defendant herein was sentenced pursuant to La.R.S. 14:30.1 which requires a mandatory sentence of life imprisonment at hard labor, Defendant's sentence is determinate and the failure to state such is harmless error. *See*, *State v. Porter*, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115.

sentence at hard labor without benefit of parole, probation, or suspension of sentence due to the mitigating factors present in this case; (b) counsel failed to object to the excessiveness of the life sentence; and (c) counsel failed to file a motion to reconsider the sentence to preserve for appellate review the issue of whether Defendant was exceptional and deserving of a downward departure from the statutorily mandated sentence.

## DISCUSSION

Defendant's assignments of error are interrelated. Therefore, we will address them together.

Defendant first contends that his statutorily mandated life sentence is excessive because of his alleged diminished culpability. Accordingly, he argues he should receive a downward departure from the single sentence the legislature mandated in La.R.S. 14:30.1(B). He further notes he would be precluded from advancing this argument because trial counsel failed to argue and present evidence at his sentencing hearing that he was deserving of a downward departure from the mandatory sentence, and he failed to object to his sentence and chose not to file a motion to reconsider sentence under La.Code Crim.P. art. 881.1. Thus, he argues these failures evidence trial counsel provided ineffective assistance during the sentencing phase, and this court should assess that claim.

In *State v. Reed*, 00-1537, pp. 21-22 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, 1274-75, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391, a case that addressed similar claims of ineffective assistance of counsel, we stated:

> Defendant alleges that his life sentence, although statutorily mandated, is excessive under the circumstances of this case. Defendant argues in the alternative that there was no strategic reason for defense counsel to have ignored the requirements of La.Code Crim.P. art. 881.1; he, therefore, received ineffective assistance of counsel.

3

As noted, Defendant did not make or file a motion to reconsider his sentence. Pursuant to Article 881.1, Defendant had thirty days from the date of sentencing to make or file a motion to reconsider. Absent a timely motion, this court is precluded from a review of the sentence on appeal. *State v. Joubert,* 97–1093 (La.App. 3 Cir. 2/4/98)[,] 705 So.2d 1295, *writ denied,* 98–1525 (La.10/30/98)[,] 723 So.2d 973.

However, inasmuch as Defendant raises allegations of ineffective assistance of counsel for failure to make or file a motion to reconsider his sentence, and the record before us enables us to do so, we will address this issue.

. . . .

This court held in *State v. Judge*, 99–1109 (La.App. 3 Cir. 3/1/00)[,] 758 So.2d 313, [*writ denied*, 01-1094 (La. 3/28/02), 812 So.2d 641,] that there could be a basis for an ineffective assistance claim if a defendant can show a reasonable probability that, had counsel filed or made a motion to reconsider the sentence, the sentence would have been different.

The record before us is complete and allows us, as we did in *Reed*, to address the issue of trial counsel's ineffective assistance at the sentencing hearing. To prevail on his ineffective assistance of counsel claim, Defendant must show from the outset that his trial counsel's deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Accordingly, in the present case, unless Defendant can show a downward departure from the mandatory life sentence for second degree murder was warranted, he cannot meet *Strickland*'s prejudice test.

It is well-accepted that a trial court is required to impose sentences the legislature prescribed unless the sentences are unconstitutional. *State v. Dorthey*, 623 So.2d 1276 (La.1993). Under La.R.S. 14:30.1, second degree murder has only one possible constitutional sentence—mandatory life imprisonment without the benefit of probation, parole, or suspension of sentence.

In *State v. Watson*, 15-392, pp. 14-15 (La. App. 3 Cir. 10/7/15), 175 So.3d 1192, 1202, *writ denied*, 15-2046 (La. 11/7/16), 208 So.3d 897, this court stated:

Louisiana Revised Statutes 14:30.1 provides that the punishment for second degree murder is life imprisonment without the benefit of parole, probation, or suspension of sentence. Quoting *State v. Williams*, 445 So.2d 1264, 1269 (La.App. 3 Cir.), *writ denied*, 449 So.2d 1346 (La.1984), the State in the instant case noted that "[i]t is 'an exercise in futility' for a trial court to consider sentencing factors when imposing a mandatory sentence when the trial court [has] no discretion in sentencing a defendant." Moreover, while discussing the possibility of a downward departure from a mandatory life sentence for second degree murder, in *State v. Runyon*, 05–36, p. 33 (La.App. 3 Cir. 11/2/05), 916 So.2d 407, 429–30, *writ denied*, 06–1348 (La. 9/1/06), 936 So.2d 207, and *writ denied*, 06–667 (La.11/17/06), 942 So.2d 526, this court noted:

> Citing *State v. Dorthey*, 623 So.2d 1276 (La.1993), and *State v. Sepulvado*, 367 So.2d 762 (La.1979), [defendant] contends that his mandatory life sentence for a second-degree murder conviction is too severe and that he should either be resentenced or a more appropriate sentence should be imposed by this court.
>
> In *State v. Paddio*, 02–722, pp. 16–17 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1131, *writ denied*, 03–402 (La. 2/13/04), 867 So.2d 682 (citations omitted), this court discussed the imposition of life sentences under La.R.S. 14:30.1, stating:
>
>> [A] court may depart from a minimum sentence only if it finds that there is clear and convincing evidence that rebuts the presumption of constitutionality. To rebut the presumption, a defendant must show, by clear and convincing evidence, that, "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case."
>
>> Defendant . . . set forth no mitigating reasons why his sentence is cruel, unusual, or too severe. He makes no attempt to set forth unusual circumstances that rebut the presumption of constitutionality; thus[,] he has failed to meet his burden of proof on this point. The gravity of the offense merits the punishment prescribed by the legislature, and Defendant . . . makes no showing to the contrary.

*See also State v. Ross*, 03–564 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, *writ denied*, 04–376 (La. 6/25/04), 876 So.2d 829.

Accordingly, it is incumbent upon Defendant to raise the question of whether the mandatory life sentence for the offense of second degree murder was inappropriate in his case. This, he did not do. There was no discussion at the sentencing hearing regarding such a concern, nor did Defendant raise it in a motion to reconsider the sentence.

In the present case, Defendant argues that trial counsel was required to explicitly argue for a downward departure at the sentencing hearing, see *Watson*, 175 So.3d at 1202, and that constituted the basis for his ineffective-assistance claim. There is no reason for a court deciding an ineffective assistance claim to address such component, if the defendant makes an insufficient showing of prejudice. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* Commenting on the assessment of prejudice from trial counsel's errors, the *Strickland* court noted:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given[ ] and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.*, 466 U.S. at 695–96, 104 S.Ct. at 2069.

Defendant, who was thirty-four years of age when he murdered Scasino, presents a twofold argument to justify a downward departure from the mandated life sentence—his mental health and his mental functioning. To get a better perspective

6

on Defendant's argument and assess the determination of prejudice, a review of the record is necessary to provide a picture of his mental health.

In that regard, it is unrefuted that Defendant showed no delusional episodes until he was involved in a 1998 car accident that profoundly affected him. At that time, he drove his automobile at an excessive speed, struck a tree, and was ejected through the rear window of the vehicle. He remained in a coma for approximately forty-five days; at that time his brain was full of fluid, and he almost severed his neck. After he regained consciousness, he was moved to a rehabilitation center, where he was still unable to sit up and eat. In time, he was able to sit in a wheelchair, and he eventually progressed to the point where he could ambulate with the help of canes and perform daily tasks. His parents, Cynthia Pierce and James Kight, testified Defendant was totally different after he suffered this traumatic brain injury. Eventually, Defendant was able to live alone, manage his own finances, and take care of himself.

Defendant's parents and various relatives described numerous delusions that he had commencing after his accident and continuing up to the time of Scasino's murder, almost sixteen years later. Among Defendant's delusions were the following: his assertion that he told the President of the United States where Saddam Hussain hid; he worked for the CIA and President, and they were going to get him out of jail; he worked for Cheryl Tiegs, and he was good friends with Oprah, Dr. Phil, and Reba McIntire; and he and his father could fly faster than the speed of light.

However, of the various delusions, the one that would play the most active part in Scasino's murder was Defendant's fixation on ninjas. According to Defendant, it was because he had a ninja that he was able to do the things outlined just above. He also feared that there existed "others" who would enter his house and

7

talk to him. In one conversation with his mother, Defendant explained that he lined his apartment, and then later his trailer, with aluminum foil because these "other intruders" could take his camper and twist it back like a can opener. In another conversation with his father, he explained his foil-covered abode as being necessary because the ninjas were after him.

Defendant and Scasino were neighbors and friends who lived next to each other. On more than one occasion, without any factual basis, Defendant would call Scasino a child molester. On the day before the killing, a Vinton 9-1-1 operator received a telephone call from someone who identified himself as Daniel Kight. The caller reported that he heard noises coming from Scasino's trailer and asked that a Calcasieu Parish deputy be sent to remove a child from Scasino's trailer; the caller was concerned that Scasino was doing something to the little girl. In the course of the 9-1-1 call, the caller commented that if the police wanted to see the caller choke the life out of Scasino and rip his nuts off, they could ignore the call.

Randall Ravia ("Detective Ravia"), a detective with the Calcasieu Parish Sheriff's Office, responded to the 9-1-1 call. Detective Ravia testified he spoke with Defendant and Scasino, looked into Scasino's trailer, and found no children or evidence that children were present. Scasino told Detective Ravia that Defendant would often smoke weed, get mad at him, and all would be fine the next day. Detective Ravia further testified that he spoke with Defendant and told him that he found no children inside Scasino's trailer. Although Detective Ravia could not remember Defendant's mental state, he recalled that Defendant told him he had smoked marijuana before the police arrived. When his call sheet for services was shown to him at Defendant's trial, Detective Ravia testified that the code shown on the sheet, 103M, meant "possible mental subject."

8

Dr. Jerry Whiteman ("Dr. Whiteman"), an expert in psychology who testified as a defense witness, related a conversation in which Defendant described the killing to him. Defendant told Dr. Whiteman that he thought he was defending a little girl and explained that he cut Scasino from his neck to his genitalia to get the ninja out that was hiding inside him.

Two psychiatrists, Dr. Patrick Hayes and Dr. James Anderson, examined Defendant at length prior to trial, testified at various pre-trial hearings regarding Defendant's mental health, and testified again at Defendant's trial; all in all, during the course of more than three and one-half years, these two psychiatrists participated in four separate hearings regarding Defendant's mental state.[3] Although both psychiatrists concluded Defendant knew right from wrong at the time of the murder, they both acknowledged Defendant's failure to take his prescriptive medication, coupled with his use of illegal drugs, exacerbated the delusions from which Defendant suffered. In fact, Dr. Hayes opined that Defendant would do fine if he properly took his prescriptive medications and if he lived in a controlled environment.

Dr. Hayes also addressed Defendant's intelligence; after reviewing various Wechsler test results, he noted Defendant's IQ was somewhere between seventy-five and eighty-two, a low average score. In addition, Dr. Whiteman, Defendant's expert, concluded that Defendant was delusional at the time of the murder but opined that Defendant's long-time substance abuse greatly contributed to his delusions and

---

[3] Defendant's mental status was the subject of pre-trial hearings before Judge Wyatt on December 14, 2014, December 16, 2015, and October 12, 2016. At the conclusion of each of those hearings, the trial court agreed with the psychiatric experts that Defendant was sane at the time of the offense and competent to stand trial. Defendant's four-day bench trial which began on February 14, 2018, also focused at great length on his mental health. After hearing from psychiatrists, psychologists, and lay witnesses, many of whom were related to him, the trial court rejected Defendant's plea of not guilty by reason of insanity.

paranoia; he, too, administered a Wechsler test and determined Defendant's full-scale IQ was seventy-five.

Defendant's arguments are similar to the argument presented in *State v. Little*, 50,776 (La.App. 2 Cir. 8/10/16), 200 So.3d 400, *writ denied*, 16-1664 (La. 6/16/17), 219 So.3d 341, in which a defendant, who was twenty-two years of age, pled guilty to the second degree murder of a convenience store clerk during a robbery and sought a downward departure from the mandatory life sentence without benefits he received under La.R.S. 14:30.1.

In *Little*, 200 So.3d at 402, the defendant argued that he was only twenty-two years of age, a first felony offender, and mentally retarded, as his IQ "fell between 42 and 55 and allegedly equated to a mental age of nine years old." The second circuit, noted that "[a]lthough courts have the power to declare a mandatory minimum sentence excessive[,]" that "power should be exercised only in rare cases and only when the court is firmly convinced that the minimum sentence is excessive." *Id.* at 403. It further stated, "the defendant must clearly and convincingly show that he is 'exceptional' by proving that the imposed sentence is not meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case." *Id.* at 404. Ultimately, the second circuit denied the defendant's claim that he was entitled to a downward departure.

Likewise, this court addressed a similar claim in *State v. Monceaux*, 17-1052 (La.App. 3 Cir. 5/9/18) (unpublished opinion). In *Monceaux*, the defendant, who was nineteen years of age, claimed his limited education and intellectual functioning rendered him the equivalent of a juvenile; thus, he argued, he should not receive a mandatory life sentence without benefits for the aggravated rape of a boy who was seven years of age. As in *Little*, the defendant argued his youth and diminished

mental capacity should entitle him to be treated like a juvenile for sentencing purposes. Finding the defendant's actions exhibited deliberate thought, this court found the defendant did not prove he deserved a downward departure from the mandatory sentence he received and, therefore, he failed to prove he suffered prejudice from trial counsel's failure to file a motion to reconsider sentence.

Finally, in *State v. Thomas*, 50,898 (La.App. 2 Cir. 11/16/16), 209 So.3d 234, the defendant argued that he should have received a downward departure from life imprisonment for aggravated rape. In that case, the defendant premised his argument, in part, on the medical findings that he was bipolar, schizophrenic, and off his psychiatric medication. Finding the defendant's mandatory minimum sentence justified, the second circuit viewed the brutality of the crime and the severity of the wounds he inflicted upon the victim.

In the present case, a day after telling a 9-1-1 dispatcher that he would kill Scasino and rip his genitalia off, Defendant stabbed his victim more than a dozen times, cut open his chest from the neck to the genitalia post-mortem, and gelded him. Considering the totality of the evidence presented to the trial court, including the four comprehensive hearings on Defendant's mental status, the details his family provided, and the brutality of Defendant's crime, we find Defendant did not prove this is one of those rare cases which deserves a downward departure from the mandatory sentence he received. Therefore, he fails to prove he suffered prejudice from trial counsel's failure to argue and present evidence at sentencing to establish a downward departure, to object to the sentence as excessive, and to file a motion to reconsider sentence. Thus, Defendant's claim of ineffective assistance of counsel likewise fails. Accordingly, Defendant's sentence is affirmed.

**AFFIRMED.**

11